UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Honeywell International Inc.,

        Plaintiff,

v.                                        Civil No. 11-569 (JNE/TNL)
                                             ORDER

ICM Controls Corp.,

        Defendant.

---

Matthew L. Woods and Peter N. Surdo, Robins Kaplan Miller & Ciresi LLP, appeared for Plaintiff Honeywell International Inc.

Allen W. Hinderaker, Heather J. Kliebenstein, and Tong Wu, Merchant & Gould PC, appeared for Defendant ICM Controls Corp.

---

      Plaintiff Honeywell International Inc.'s ("Honeywell") amended complaint in this action asserts 19 counts against Defendant ICM Controls Corp. ("ICM") for alleged patent infringement, copyright infringement, Lanham Act violations, and a violation of Minn. Stat. § 325D.44.  ECF No. 32.  Honeywell's complaint alleges that ICM has been selling "direct knockoffs" of four Honeywell combustion control products used for controlling heating appliances.  The relevant Honeywell products include two "oil primary controls"—R8184 and R7184.  An oil primary control controls the fuel oil for an oil-based furnace, water heater, or boiler.  The other two Honeywell products are gas ignition controls—S8610U and S8910U.  A gas ignition control controls the gas ignition of a gas furnace, water heater, or boiler.  Honeywell sells its gas ignition controls in the residential and light commercial replacement market, as replacements for a variety of original equipment manufacturer ("OEM") controls.  It sells its oil primary controls in the residential and light commercial markets, as OEM and replacement units.

For each of Honeywell's four products, the amended complaint identifies a corresponding control product sold by ICM. Honeywell contends that the ICM 1510 Series corresponds to Honeywell's R7184, the ICM 1500 Series corresponds to Honeywell's R8184, the ICM 290 corresponds to Honeywell's S8610U, and the ICM 283 corresponds to Honeywell's S8910U. ECF No. 32 at 4-7. These ICM products form the target of Honeywell's trade dress infringement, false advertising, and state law claims. Honeywell alleges that certain installation manuals and labels for ICM's control products infringe its copyright interests. Honeywell also asserts four patents against particular ICM control products and certain ICM thermostats used in connection with combustion controls.

The case is before the Court on three summary judgment motions filed by Defendant ICM, ECF Nos. 241, 247, 260, as well as motions filed by both parties to exclude the proposed testimony of multiple expert witnesses for failure to meet the admissibility requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), ECF Nos. 227, 234, 253, 266, 273. The motions and their dispositions are as follows:

1. ICM's motion for summary judgment of invalidity of U.S. Patent No. 5,812,061 ("'061 patent"), U.S. Patent No. 7,055,759 ("'759 patent"), and U.S. Patent No. 6,478,574 ("'574 patent"), ECF No. 247 – The motion is granted with respect to the '574 patent and otherwise denied.

2. ICM's motion for summary judgment of Honeywell's false advertising (false designation of origin) claim, ECF No. 241 – The motion is granted.

3. ICM's motion for summary judgment of Honeywell's trade dress infringement claims, ECF No. 260 – The motion is granted.

4. Honeywell's *Daubert* motion seeking to exclude testimony of Robert Stein, Leon Kaplan, and Adam Vaczek, ECF No. 273 – The motion is denied on mootness grounds as to Mr. Stein. It is denied without prejudice as to Dr. Kaplan. The motion is granted in part and denied in part as to Mr. Vaczek.

5. ICM's *Daubert* motion to exclude the testimony of Akshay Rao, ECF No. 253 – The motion is denied as moot.

6. ICM's *Daubert* motion to exclude the testimony of Justin Hughes, ECF No. 227 – The motion is granted.

7. ICM's *Daubert* motion to exclude Carl Degen's testimony on reasonable royalties for the alleged patent infringement, ECF No. 266 – The motion is denied.

8. ICM's *Daubert* motion to exclude miscellaneous testimony of David Schumacher, Carl Degen, and Thomas Gafford, ECF No. 234 – The motion is denied as to Mr. Schumacher and in part as to Mr. Gafford on mootness grounds. The motion is denied as to Mr. Degen and in part as to Mr. Gafford without prejudice so that objections to particular testimony may be raised at trial, if appropriate.

## DISCUSSION

The standards applicable to summary judgment as well as to *Daubert* motions are well established and well known. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view facts that the parties genuinely dispute in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that

A witness who is qualified as an expert by knowledge, skill, experience, training, or

education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of
fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The factors that a district court may consider in making reliability and relevancy

determinations include: "(1) whether the theory or technique can be or has been tested; (2)

whether the theory or technique has been subjected to peer review or publication; (3) whether the

theory or technique has a known or potential error rate and standards controlling the technique's

operation; and (4) whether the theory or technique is generally accepted in the scientific

community." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456-57 (8th Cir. 2012) (citing *Daubert*,

509 U.S. at 593-94).[1]  But the "evidentiary inquiry is meant to be flexible and fact specific, and a

court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v.

Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  As long as the expert's proffered

opinions appear reliable and relevant, no single requirement for admissibility exists. *Id*.

The "traditional and appropriate means of attacking shaky but admissible evidence" are

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof." *Daubert*, 509 U.S. at 596.  The *Daubert* inquiry should therefore focus on

"principles and methodology" rather than on the "conclusions that they generate." *Daubert*, 509

U.S. at 595.  Similarly, the factual basis of an expert's opinion generally "goes to the credibility

of the testimony, not the admissibility, and it is up to the opposing party to examine the factual

---

[1]      Honeywell's complaint includes patent claims.  While Federal Circuit law applies to
those claims, the admissibility of expert testimony related to them is generally governed by the
law of the regional circuit. *See Research Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255
(Fed. Cir. 2008).

4

basis for the opinion in cross-examination." *Bonner v. Isp Techs*., 259 F.3d 924, 929-30 (8th Cir.

2001) (quoting *Hose v. Chicago Northwestern Transp. Co*., 70 F.3d 968, 974 (8th Cir. 1996)).

    With these standards in mind, the Court turns to each of the motions.

**1.  ICM's Motion for Summary Judgment of Invalidity of the '061 Patent, the '759 Patent, and the '574 Patent**

ICM seeks summary judgment of invalidity of three of the four patents[2] that Honeywell

has asserted against it in this action.  ICM contends that claims 1-4 and 9 of the '061 patent are

invalid for failure to meet the enablement and written description requirements of 35 U.S.C. §

112, first paragraph.[3]  ECF No. 249 at 1.  ICM alleges that claims 3,7, and 8 of the '759 patent

are invalid for lack of an adequate written description.  *Id.*  For the '574 patent, ICM takes the

position that claim 1 is invalid for indefiniteness, i.e. for failure to meet the definiteness

requirement of 35 U.S.C. § 112, second paragraph.  *Id.*  The relevant patent law and its

application to ICM's contentions about each of the three patents are discussed next.

    A.  Legal framework for assessing ICM's claims of invalidity

    A patent is presumed valid and a party challenging its validity bears the burden of

establishing its invalidity.  *See* 35 U.S.C. § 282(a).  Invalidity must be established by clear and

convincing evidence.  *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1354 (Fed. Cir.

2010).  The first paragraph of § 112 contains two separate description requirements: a written

description requirement and an enablement requirement.  *Id.* at 1344.  The second paragraph of §

112 requires a patent specification to conclude with one or more claims "particularly pointing out

and distinctly claiming the subject matter which the applicant regards as his invention."  35

---

[2]    Asserted U.S. Patent No. 7,721,972 is not subject to the present motion.
[3]    The Leahy-Smith America Invents Act ("AIA"), Pub. L. 112-29, amended 35 U.S.C. §§ 112 and 282 in minor respects not relevant here.  The prior versions of those provisions apply to the patents at issue in this case.  Therefore, this order refers to the relevant paragraphs and text as they existed prior to the AIA amendments.

U.S.C. § 112, ¶ 2.  A patent claim that fails to meet the enablement, written description, or definiteness requirements of § 112 is invalid.  *Id.* § 282, ¶ 2(3).

To meet the enablement requirement, the specification must enable one of ordinary skill in the art to practice the full scope of the claimed invention without undue experimentation. *MagSil Corp. v. Hitachi Global Storage Techs.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012).  The specification need not "describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability of the art," but "when a range is claimed, there must be reasonable enablement of the scope of the range."  *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  Enablement is a question of law based on underlying factual determinations.  *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1369 (Fed. Cir. 2014).

To satisfy the written description requirement, the specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed."  *LizardTech, Inc. v. Earth Res. Mapping, Inc*., 424 F.3d 1336, 1345 (Fed. Cir. 2005); *Ariad*, 598 F.3d at 1351 (noting that disclosure is the "hallmark of written description" and so "possession as shown in the disclosure" is key).  The test entails "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" as to whether the specification "describe[s] an invention understandable to that skilled artisan and show[s] that the inventor actually invented the invention claimed."  *Ariad*, 598 F.3d at 1351. Although a question of fact, compliance with the written description requirement is amenable to

summary judgment when no reasonable jury could find in favor of the nonmoving party.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).  The enablement

and written description requirements usually rise and fall together, *LizardTech*, 424 F.3d at 1345,

but they need not necessarily, *see Ariad*, 598 F.3d at 1352.  Both are evaluated as of the effective

filing date of the patent.  *Id.* at 1351; *AK Steel*, 344 F.3d at 1244.

   The Supreme Court recently articulated the relevant standard applicable to the

definiteness requirement of the second paragraph of § 112.  *See Nautilus, Inc. v. Biosig

Instruments, Inc.*, 134 S. Ct. 2120, 2128-30 (2014).  Under that standard, a patent's claims, when

"viewed in light of the specification and prosecution history," must "inform those skilled in the

art about the scope of the invention with reasonable certainty."  *Id.*  Recognizing that some

"modicum of uncertainty" is the price to be paid for appropriate incentives for innovation, the

Supreme Court nonetheless confirmed that a patent "must be precise enough to afford clear

notice of what is claimed, thereby apprising the public of what is still open to them."  *Id.*

(internal quotation marks omitted).  Patents are not directed to lawyers or the public generally,

but to those skilled in the relevant art.  *Id.*  Indefiniteness is, therefore, gauged from the

perspective of one of skill in the art as of the time of patent application.  *See id.* at 2130.

Although an indefiniteness claim might have factual issues on which it depends, the

determination is "a legal conclusion that is drawn from the court's performance of its duty as the

construer of patent claims."  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347

(Fed. Cir. 2005).

   B.   ICM's claim of lack of enablement and written description for claims 1-4 and 9 of the
        '061 patent

   ICM's invalidity argument for the relevant claims of the '061 patent focuses on the term

"value differentiator," which first appears in the claims in independent claim 1.  The '061 patent

is titled "Sensor Condition Indicating System" and, in the words of the specification, the invention "comprises apparatus for signaling the approximate numeric value encoded in a variable input signal." '061 patent col. 2 ll. 62-64.  In simplified terms, claim 1 of the patent provides that the apparatus includes (a) a "value differentiator" that receives an input signal and provides a "range signal," reflecting which one of a set of predetermined, non-overlapping value ranges the input signal falls within; and (b) a "signaling unit" that receives the range signal and provides a human perceptible signal corresponding to the range signal received.  *Id.* claim 1. The specification describes using the claimed invention in a furnace or boiler to generate a light or sound signal for signaling when the sensor that detects the presence of a flame in the furnace or boiler is malfunctioning.  *Id.* col. 1 l. 44 – col. 3 l. 11.

Based on the specification's definition of the term "value differentiator," the Court previously construed the term as

> a device that receives an input signal, categorizes the signal into one of a plurality of preferably non-overlapping value ranges, and provides a range signal encoding one of a predetermined finite set of indicator values, where each of the indicator values corresponds to a single value range of the input signal.

ECF No. 67.  In making both its enablement and written description arguments, ICM relies heavily on the following paragraph from the specification as setting out a very broad scope of the invention that is not adequately supported by the specification:

> There are many different ways in which each of the components comprising the invention may be implemented. While shown here as for the most part arising from instruction execution by microprocessor 27, it is also possible to implement the invention as a custom circuit. The reader should understand that the specific implementation disclosed for these elements is likely one of literally hundreds, and that it is neither practical nor statutorily required to disclose each and every one of them in order to achieve the scope of patent protection to which I believe I am entitled. When a particular component not having a known presence in the art is first mentioned, its function will be described and my intent is to include any of these various embodiments within that description.

8

'061 patent col. 6 ll. 14-27.  ICM contends that the specification only discloses using a

"microprocessor" or a "custom circuit" to function as the "value differentiator" of the claims, but

the claims cover all sorts of other unnamed mechanisms to act as a value differentiator.

Despite the patent's assertion that hundreds of other implementations may exist, ICM has

not identified any that would fall within the scope of the term, but not be enabled or adequately

described.  While the term "value differentiator" does connote a broad scope,

as it is effectively defined in functional terms,[4] ICM has not put forward adequate evidence to

support a summary judgment determination that its full scope is not enabled or adequately

described.  Without a concrete example or description of the content allegedly covered but not

enabled and disclosed, the requisite input for an invalidity inquiry is absent.  For the enablement

query of whether "undue experimentation" is required, the Federal Circuit has identified factors

to consider such as "(1) the quantity of experimentation necessary, (2) the amount of direction or

guidance presented, (3) the presence or absence of working examples, (4) the nature of the

invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

predictability or unpredictability of the art, and (8) the breadth of the claims."  *In re Wands*, 858

F.2d 731, 737 (Fed. Cir. 1988).  And the adequacy of the written disclosure supporting "generic

claims" is evaluated by considering factors such as "the existing knowledge in the particular

field, the extent and content of the prior art, the maturity of the science or technology, and the

predictability of the aspect at issue."  *Ariad*, 598 F.3d at 1351 (internal quotation marks omitted).

ICM has not made a showing on any of these factors.  Rather, it seeks a determination that

merely because the patent makes sweeping claims about the existence of many embodiments, not

specifically discussed, it should be deemed invalid under the first paragraph of § 112.

---

[4]     Neither party contends that the term should be construed as a means-plus-function
limitation and the Court makes no determination on that issue.

ICM does not cite any case in which a court has found a lack of enablement or written description in the abstract, based on unspecified, theoretical embodiments.  Rather, those § 112 issues are typically presented with reference to a dispute over the relevant support for a concrete embodiment or genus.  *See, e.g.*, *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999-1001 (Fed. Cir. 2008) (confirming lack of enablement of a claim covering integration of a user's audio signal or visual image into a pre-existing video game or movie, where the specification only taught the integration into video games and not movies); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007) (affirming summary judgment of inadequate enablement of a claim covering both mechanical and electronic side impact sensors, where specification only adequately enabled the mechanical sensors); *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1341-45 (Fed. Cir. 2013) (affirming jury finding of inadequate written description of generically claimed "openings," deemed to cover "slots," where specification only described "grooves"); *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) (affirming determination of a lack of adequate written description for claims generically covering "vertebrate" or "mammal" insulin cDNA, where the specification only described "rat" insulin cDNA).  In contrast, ICM has not identified any category of devices or applications that would qualify as "value differentiators" but that have not been adequately described or enabled. Without such an identification and a demonstration of the failure to meet the § 112 requirements, ICM cannot prevail on summary judgment.  The passage on which it relies appears to be little more than a grandiose expression of the common hedging that appears in patent specifications to assert that other embodiments, not specifically disclosed, are covered by the claims.

C.  ICM's claim of lack of written description for claims 3, 7, and 8 of the '759 patent

ICM argues that claims 3, 7, and 8 of the '759 patent are invalid for failing to meet the written description requirement.  The '759 patent is titled "PDA Configuration of Thermostats" and relates to "configuring, setting and adjusting of programmable thermostats of air management systems."  '759 patent col. 1 ll. 6-9.  The claims refer to configuring thermostats using a "portable configuring" apparatus or device and the specification discusses a PDA or "personal digital assistant" as an example of such a portable apparatus.  *See id.* col. 1 ll. 53-56. According to the summary in the specification, the invention "makes it possible for one at a convenient time at nearly any place to set and adjust" various parameters of an air management system, such as temperatures, humidity, sensor selection, volume of air movement, etc.  *Id.* col. 1 ll. 38-53.

For its argument of a lack of written description, ICM contends that the specification does not describe a "transfer" of configuration information from one air management system to another via the portable configuration apparatus, but claims 3, 7, and 8 refer to such a transfer. Claim 3 provides as follows:

> A configuring system comprising: a portable configuring apparatus; and wherein: the portable configuring apparatus is connectable to each air management system of a plurality of air management systems; and the portable configuring apparatus may transfer a configuration of one air management system to another air management system of the plurality of air management systems.

Claim 7 provides:

> A configuring system, comprising: one or more air management systems each including a local air management controller; and a portable configuring apparatus connectable to each local air management controller, the portable configuring apparatus adapted to transfer configuration information from at least one local air management controller to at least one other local air management controller.

Claim 8 depends on claim 7.

11

ICM contends that the specification only describes configuring a single thermostat using the portable device.  It notes that the concept of a "transfer" between systems was added during prosecution.  In particular, the original claims filed on August 18, 2003, did not refer to a transfer, but an amendment dated July 23, 2004, added it.  ECF No. 37-5 at 124-29, 193-99. ICM also contends that the "transfer" element is missing from the specification such that summary judgment of invalidity for failure to meet the written description requirement is warranted.  The Court disagrees.

While the specification's detailed description focuses on configuration of a single thermostat, *see e.g.*, '759 patent Figure 1, col. 6 l. 64 – col. 8 l. 6, the summary does include content that could provide adequate written description support for the concept of transferring configurations between systems.  In a single passage, the summary notes that configuration information from a controller of one system may be "uploaded to the PDA," *id.* col. 1 ll. 59-61, one "may configure, set and adjust" or do "other things" with the parameters, *id.* col. 2 ll. 1-6, and "[t]hen one may take the PDA and go to the *various* thermostats, controllers, computers or other air management system control devices and upload the programs specific to the respective *systems*," *id.* col. 2 ll. 6-9 (emphasis added).  The reference to a plurality of thermostats and systems that receive the configurations suggests that the configuration information previously loaded onto the PDA from one system could be transferred from the PDA to a different system.

ICM does not point to any part of the specification in which the inventors suggest that their invention does not cover transfers between systems of configuration information using the PDA, such that the written description might fail to support the later-claimed subject matter.  *Cf. Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (pointing to statements in the specification distinguishing the conical shape of the invention from other shapes in the prior art

as evidence of a lack of written description to support a claim that covered other shapes).  A reasonable jury could conclude that the passage from the specification discussed above supports a finding of adequate written description for the concept of a transfer.  ICM, therefore, has not met its burden of showing on summary judgment that claims 3, 7, and 8 are invalid for lack of written description.

### D. ICM's claim of indefiniteness of claim 1 of the '574 patent

ICM contends that claim 1 of the '574 patent is indefinite based on an apparent, and likely inadvertent, omission of some language.  Claim 1 provides as follows:

> In a burner control system having an igniter, motive means to direct fuel to be ignited, a flame detector to determine the occurrence of combustion and a safety lockout which, when activated, at least temporarily disables the system if fuel ignition does not occur within a predetermined time after occurrence of a predetermined one of energizing the igniter, energizing the motive means, and energizing both the igniter and the motive means, which safety lockout may undesirably delay completion of a system start-up sequence in certain predetermined situations where the system requires priming before the motive means can produce a necessary fuel flow, *comprising*:
>
>> switch means connected to the system and operable upon activation to produce a signal; and
>>
>> timing means connected to receive the signal and operable to extend the time between occurrence of the predetermined one of energizing the igniter, energizing the motive means and energizing both the igniter and the motive means, and the imposing of the lockout condition to a value normally sufficient to allow priming of the system.

'574 patent claim 1 (emphasis added).  ICM notes that the structure of claim 1 makes it apparent that some language is missing, likely just before the word "comprising."  The basic structure of claim 1, as written, is "[i]n a burner control system…, comprising: switch means…; and timing means…."  ICM argues that the sentence lacks an "object" that comprises the "switch means" and "timing means."  ECF No. 249 at 9-10.

ICM points out that Honeywell has offered different phrases that could be the missing language.  ICM contends that those phrases vary in terms of the claim scope that they imply and so the omitted language renders the claim indefinite.  In connection with claim construction proceedings, one of Honeywell's experts, Mr. Thomas Gafford, opined that claim 1 of the '574 patent is in so-called Jepson format and the missing language is "the improvement" or "the invention."  ECF No. 49 ¶¶ 53-59.  Jepson format refers to a distinctive form of claiming an improvement to the prior art.  *See* 37 C.F.R. § 1.75(e).  ICM notes that Mr. Gafford now contends that one of skill in the art would understand that the missing language is "a controller." *See* ECF No. 250-1 ¶ 146.  ICM argues that the scope of the claim is not reasonably certain, because in Jepson format the preamble would be limiting, *see Kegel Co. v. AMF Bowling*, 127 F.3d 1420, 1426 (Fed. Cir. 1997), while the use of "a controller" would result in the preamble not being a limitation.  ECF No. 249 at 10.

Whether or not the preamble is limiting if "a controller" were the missing language is debatable.[5]  Nonetheless, the Court need not decide the issue, because the scope of the claim

---

[5]     Although generally a preamble does not limit a claim, it "may be limiting when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention."  *Allen Eng'g Corp. v. Bartell Indus*., 299 F.3d 1336, 1346 (Fed. Cir. 2002) (internal quotation marks omitted).  The Federal Circuit has explained that a preamble is limiting when it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l v. Coolsavings.com, Inc*., 289 F.3d 801, 808 (Fed. Cir. 2002) (internal quotation marks omitted).  Conversely, it is not limiting where the claim defines a structurally complete invention in the claim body and the preamble merely states the purpose or intended use of the invention.  *Id*.  As written, the body of claim 1 of the '574 patent would have little meaning without the preamble and it is debatable whether the addition of the term "a controller" would materially change it.  Moreover, the body refers back to elements set out in the preamble—"the system" and "the predetermined one of energizing the igniter, energizing the motive means and energizing both the igniter and the motive means"—and such references are often a signal that the preamble is limiting.  *See Proveris Sci. Corp. v. Innovasystems, Inc*., 739 F.3d 1367, 1372 (Fed. Cir. 2014) ("Additionally, when limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.") (internal quotation marks omitted).

would differ based on the replacement term selected under either scenario. If, as ICM contends, use of "a controller" would not make the preamble limiting, then the scope of the claim differs if "a controller" were chosen, as compared to if "the improvement" or "the invention" were selected, because the Jepson format would render the preamble limiting. But even if the preamble were limiting with use of "a controller," the scope of the claim under the two options differs. In particular, under a plain reading of the claim, the use of "improvement" or "invention" would imply that the elements following the term "comprising"—the switch means and the timing means—would not need to be part of the controller[6] component of the system, while the choice of "controller" would restrict them to it.

A review of the intrinsic evidence shows that if the missing language is not "a controller," but is "the improvement" or "the invention," the comprising elements would not be constrained to the controller. According to the specification, the invention "relates to burner systems and more particularly to an oil burner system and control that will, when needed, provide for pumping of oil through the system in a manner to avoid going into safety lockout without overriding the safety function." '574 patent col. 1 ll. 6-11. The patent describes a typical prior art burner system, which includes a "primary controller." *Id.* col. 1 ll. 13 – 52. A reset button is provided to reset the controller after a safety lockout that typically occurs during initial set-up and other service circumstances, but is not necessary. *Id.* col. 1 l. 52 – col. 2 l. 18. The invention primarily improves on the prior art by providing a "pump priming" or "pump

---

[6]     The '574 patent refers to a "primary controller" and "controller" interchangeably and gives Honeywell's R8184 product as an example. *See, e.g.*, '574 patent col. 1 ll. 33-34, col. 4 l. 36. The specification's depictions of the controller are all as a distinct component of the system, separate from other items that the preamble makes part of the "burner control system," like the "flame detector." *See id.* col. 1 ll. 15-32. Honeywell has not argued that despite the characterizations in the specification, the term controller lacks physical structure and refers only to a function.

purging" mode.  *Id.* col. 2 ll. 21 – 24.  A service technician can place the primary control into

that mode using a predetermined technique, for example by pushing and releasing the reset

button during certain operation states.  *Id.* col. 2 ll. 52-58.  The mode allows the "safety switch

timing to be extended, for example, from 30 seconds to 4 minutes" so that the safety lockout may

be avoided.  *Id.* col. 2 ll. 58-62.

The specification of the '574 patent does not use the terms "switch means" or "timing

means" that appear in claim 1.  But the function of the switch means in claim 1 as well as the

characterization of "a switch" in claim 10 indicate that the "reset button" described in the

specification is an example of a switch means.  Significantly, for present purposes, the

specification does not describe the reset button as necessarily part of the controller, although it

allows for the possibility.  *See, e.g.*, *id.* Figure 1.

The '574 patent also refers to a "restricted lockout feature" and cites a co-pending

application filed by the same inventors.  *Id.* col. 2 ll. 31-37.  A review of the patent resulting

from that application—U.S. Patent No. 6,413,078 ('078 patent)—shows that references in that

patent also support a conclusion that unless a claim specifically limits it, the reset mechanism or

switch means is not limited to the controller component of the burner control system.  The '078

patent refers to the control as an "oil primary."  '078 patent col. 1 ll. 9-10.  The background of

the invention of the '078 patent notes that a "reset button is provided *in association with* the oil

primary."  *Id.* col. 1 ll. 31-33 (emphasis added).  The italicized language suggests that the reset

button may or may not be part of the control.  The detailed description of the '078 patent

includes at least one reference that could be read as specifying it as a part of the control.  *Id.* col.

3 ll. 26-28 (noting that "oil primary 20 includes a user-actuatable reset input, commonly in the

form of a reset button 26 connected to a switch").  Claim 1 calls for "a user reset connected *as a*

*part of the oil primary*," while claim 3 calls for "a reset control *operatively connected* to receive user reset commands."  (Emphasis added.)

Thus, the intrinsic evidence beyond the claim language does not constrain the "switch means" in claim 1 of the '574 patent to being part of the controller component of the burner control system.  The lack of such a constraint implies that if the missing language in the claim were "the improvement" or "the invention," the switch means, at a minimum,[7] would not be limited to being part of the controller component of the system.  But if the missing language in the claim were "a controller," it would be because the term "comprising" follows.  The intrinsic evidence shows that either option is a plausible one, as do the two submissions of Honeywell's expert.  Since the two options entail differing limitations for the claim, the missing language in claim 1 results in a lack of reasonable certainty as to its scope.[8]  The claim is invalid for lack of definiteness.

## 2.  ICM's Motion for Summary Judgment on Honeywell's False Advertising (False Designation of Origin) Claim

ICM seeks summary judgment on Honeywell's claim for "false designation of origin" as alleged in Count XVIII of the amended complaint.[9]  With that count, Honeywell claims that ICM advertises its combustion control products as "Made in the USA" when they do not actually qualify as products made in the country.  According to the reports of ICM's experts, Adam Vaczek and Robert Stein, a significant part of the manufacturing of the relevant products— including the final assembly—occurs at a facility in Syracuse, NY.  ECF No. 244-2: Ex. B at 66-

---

[7]     In light of the determination as to the "switch means," a similar analysis of "timing means" is unnecessary.

[8]     Because more than one reasonable option for the missing language exists and the options entail differing claim scopes, the defect cannot be corrected.  *See Novo Indus., L.P. v. Micro Molds Corp*., 350 F.3d 1348, 1354-57 (Fed. Cir. 2003).

[9]     ICM's motion does not specifically identify the relevant count, but its arguments are directed to Count XVIII.

68, Ex. D at 17-19.  The conceptualization, design, testing, and other production activities also occur there.  ICM acknowledges that some foreign components are incorporated into the products, but Mr. Stein puts the value of the foreign components at between 10.4 and 23.8 percent depending on the product and characterizes them as "commodity" components.[10]  ECF No. 244-2: Ex. D at 22.  The report of Honeywell's expert, Carl Degen, provides two other calculations.  *See* ECF No. 305-3: Ex. 10 at Figures 2 and 2A.  It designates foreign "materials" costs as ranging between 33.6 and 80.2 percent depending on the product.  *Id.* at Figure 2.  Once labor and other costs are added in, the report places the foreign content of various ICM products at between 19.4 and 52.9 percent.  *Id.* at Figure 2A.

In light of the foreign content in ICM's products, Honeywell alleges that ICM's branding of them as made in this country makes ICM liable to Honeywell under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  In relevant part, § 1125(a)(1)(B) provides for a civil action against a person who uses "any false designation of origin" which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities," by "any person who believes that he or she is or is likely to be damaged by such act."  To establish a claim of false or deceptive advertising under the Lanham Act, a plaintiff must show: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to

---

[10]    He states that they are electronic components such as capacitors, resisters, and transistors. ECF No. 244-2: Ex. D at 23.

defendant or by a loss of goodwill associated with its products." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). A false statement that forms the basis of a Lanham Act claim typically falls into two categories: "(1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.*

"The standard for proving literal falsity is rigorous" and "only an *unambiguous* message can be literally false." *Buetow v. A.L.S. Enters.*, 650 F.3d 1178, 1186 (8th Cir. 2011) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)) (internal quotation marks omitted). A literal falsity argument fails when an advertisement can reasonably be understood as conveying different messages. *Id.* Moreover, "[t]he Lanham Act doctrine of literal falsity is reserved for an ad that is unambiguously false *and* misleading—'the patently false statement that means what it says to any linguistically competent person.'" *Id.* (quoting *Schering-Plough Healthcare Prods. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009). If a statement is literally false, no extrinsic evidence of consumer deception is required. *Time Warner Cable*, 497 F.3d at 158; *Schering-Plough*, 586 F.3d at 512 (explaining that literal falsity avoids the need for "costly consumer surveys").

When a claim is not literally false, but misleading, proof that the advertising actually conveyed the implied message and deceived a significant portion of the recipients "becomes critical." *United Indus. Corp.*, 140 F.3d at 1182-83. The success of such a claim then typically turns on the persuasiveness of a consumer survey. *Id.* The Eighth Circuit has gone so far as to state that "unless a commercial claim is literally false, or a trier of fact has determined that a competitor acted willfully with intent to deceive or in bad faith, a party seeking relief under this

section of the Lanham Act bears the ultimate burden of proving actual deception by using reliable consumer or market research." *Id.*

ICM contends that Honeywell cannot meet its burden to succeed on this claim because the statement "Made in the USA" is too ambiguous to be literally false under the facts involved and Honeywell lacks the requisite survey or market research evidence to establish the deception element. ICM also points to the dictionary definition of "made" and the evidence of its activity, including final processing and assembly, in Syracuse, NY to contend that its statement is not false. Although ICM does not spend much time on literal falsity, Honeywell responds that the statement is actually literally false—so much so that summary judgment should be granted in Honeywell's favor on the issue. Honeywell also includes an argument that even if it cannot succeed on literal falsity at this stage, ICM should not win because Honeywell has enough evidence of actual deception.

A. Literal falsity

The Court agrees with ICM that the phrase "Made in the USA" is not unambiguous enough in the context of this case[11] for Honeywell to successfully establish a claim of literal

---

[11] The Eighth Circuit has recognized that there is "some disagreement whether literal falsity is a question of fact or a question of law for the court." *Buetow*, 650 F.3d at 1185 n.5. The *Buetow* opinion did not extensively discuss or decide the issue, but observed that "[t]he issue is perplexing because consumer confusion is a fact intensive issue, but whether a contract or statute is unambiguous is normally a question of law for the court." *Id.* The literal falsity inquiry in effect encompasses two determinations: whether the advertisement conveys an unambiguous statement of fact and whether that statement is false. *See id.* Acknowledging the dual inquiries, the Sixth Circuit found no conflict between the usual treatment of a statement's ambiguity as a matter of law and the determination of falsity as a question of fact. *See American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 615 n.2 (6th Cir. 1999). The undersigned agrees that while the ultimate determination of literal falsity may require resolution of factual disputes such that it is properly viewed as a question of fact, the determination of whether the statement at issue is sufficiently unambiguous is an appropriate one for resolution as a matter of law. Moreover, the question of whether an

falsity.  It is telling that despite the pervasive use of "Made in the USA" labels on products,

Honeywell does not point to a single case that has found the phrase unambiguous.  The only case

dealing with a "Made in the USA" claim that Honeywell relies on is a 1996 opinion from the

United States District Court for the Eastern District of Wisconsin.  *See Master Lock Co. v.*

*Hampton Prods. Int'l Corp.*, Civ. No. 96-213, 1996 U.S. Dist. LEXIS 19780 (E.D. Wis. Dec. 2,

1996).  The *Master Lock* opinion applied the Federal Trade Commission's ("FTC") guidelines

for "U.S. origin claims" to the Lanham Act claim in that case.  *See id.*  For a U.S. origin claim to

pass muster with the FTC, the standard that the Commission has traditionally applied and that a

1997 policy statement reaffirms is that "all or virtually all" of the advertised product must be

made in the United States.  *See* FTC Enforcement Policy Statement on U.S. Origin Claims, 62

Fed. Reg. 63,756 (notice issued Dec. 2, 1997) ("FTC Policy Statement").[12]  But *Master Lock*

does not address the question of whether the phrase "Made in the USA" is unambiguous.  *See*

1996 U.S. Dist. LEXIS 19780.  And while an FTC policy statement is accorded due weight,

*Beggs v. Rossi*, 145 F.3d 511, 512-13 (2d Cir. 1998), a "Lanham Act plaintiff must show that the

advertisements are literally false or misleading to the public, not merely that the advertisements

violate FTC guidelines," *Millennium Imp. Co. v. Sidney Frank Importing Co.*, Civ. No. 03-5141,

2004 U.S. Dist. LEXIS 11871, at *18 (D. Minn. June 11, 2004) (internal quotation marks

---

ambiguous statement that would be false under any reasonable construction is not presented or
addressed by the present case.

[12]     The Federal Trade Commission Act gives the FTC the power to prevent "unfair methods
of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting
commerce."  15 U.S.C. § 45.  Under the authorized proceedings, the Commission may issue an
order requiring a person or entity to cease and desist from a violation of the law found by the
Commission.  *See id.* § 45(b).  The Attorney General can seek civil penalties for a violation of an
order of the Commission after it becomes final and the district courts are empowered to grant
injunctions and equitable relief as appropriate in the enforcement of the Commission's orders.
*Id.* § 45(l).  The FTC has regulated what it calls "U.S. origin claims" pursuant to its general
authority under § 45.  *See* FTC Policy Statement at 63,766.

omitted).  Therefore, the Court will not convert the determination of whether ICM's "Made in the USA" statements are literally false into an inquiry of whether they meet the FTC guidelines.

Moreover, the FTC Policy Statement itself shows that the phrase "Made in the USA" is not unambiguous enough to support a literal falsity theory for purposes of Honeywell's Lanham Act claim.  The 1997 statement explains that "[a] product that is all or virtually all made in the United States will ordinarily be one in which all significant parts and processing that go into the product are of U.S. origin."  FTC Policy Statement at 63,768.  A minimum threshold under the standard is that "the final assembly or processing of the product must take place in the United States."  *Id.*  As part of that minimum threshold, the FTC requires that the product should have been last "substantially transformed"—as that phrase is used by the U.S. Customs Service, *see* 19 C.F.R. §§ 134.1, 102.11—in the United States, because "consumer perception evidence" indicated that the "country in which a product is put together or completed is highly significant to consumers in evaluating where the product is 'made.'"  *See id.*

Beyond that threshold the FTC considers other factors, "including but not limited to the portion of the product's total manufacturing costs that are attributable to U.S. parts and processing; and how far removed from the finished product any foreign content is."  *Id.*  The statement does not spell out a fixed proportion for domestic and foreign manufacturing costs that delineates the line between products that can and cannot be properly tagged as made in the country.  "Rather, the Commission will conduct this inquiry on a case-by-case basis, balancing the proportion of U.S. manufacturing costs along with the other factors discussed herein, and taking into account the nature of the product and consumers' expectations in determining whether an enforcement action is warranted."  *Id.* at 63,769.  Thus the FTC guidelines recognize

that the propriety of a "Made in the USA" claim will be product and context specific, beyond the threshold consideration of whether final assembly or processing occurs in the country.

Therefore, even under the FTC guidelines, the Court does not find the disputed phrase sufficiently unambiguous for a determination of literal falsity in this case.  And potential other articulations of what it means for a product to be "Made in the USA" exist.  ICM points to a dictionary definition of the word "made" as "built, formed, or shaped in a specified way" to support its position that the definition entails that "Made in the USA" covers products built in the country even if they incorporate foreign components.  Other federal regulations embody conceptions of what it means for a product to be made in a country.  For example, the regulations applicable to a determination of whether "iron, steel, and manufactured goods" are "produced in the United States" for purposes of section 1605(a) of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. 111-5,[13] include within the definition of a domestic manufactured good "a manufactured good that consists in whole or in part of materials from another country" that "has been substantially transformed in the United States into a new and different manufactured good distinct from the materials from which it was transformed."  2 C.F.R. § 176.160(a).  Similarly, the customs regulations applicable to imported goods incorporate a concept of "substantial transformation" in defining the foreign "country of origin" of a good.  *See* 19 C.F.R. §§ 134.1, 102.11.  Such characterizations show that a statement that a product is made in a particular country does not have a universal and definitive meaning.  In other words, the phrase "Made in the USA" is not unambiguous enough that Honeywell may

---

[13]     Section 1605(a) of the ARRA allows the use of funds made available by the Act for certain public projects, with some exceptions, only if "all of the iron, steel, and manufactured goods used in the project are produced in the United States."

pursue a theory of literal falsity in this case, where there appears to be no dispute that the final

processing and assembly of the products occur in the United States.[14]

     B.    <u>Deception in the absence of literal falsity</u>

     With the literal falsity avenue foreclosed, Honeywell cannot prevail on its false

advertising claim because it lacks adequate evidence to establish the element of deception under

an alternative theory.  As the Eighth Circuit has confirmed, under the present circumstances,

Honeywell bears the burden of proving deception with reliable consumer or market research.[15]

*United Indus. Corp*., 140 F.3d at 1182-83.  In particular, Honeywell would need to provide

evidence of "what the person to whom the advertisement is addressed finds to be the message,"

*Time Warner Cable*, 497 F.3d at 158, such that a determination of deception is possible in light

of the actual content and processing of ICM's products.  Honeywell has not proffered reliable

consumer or market research as to what the relevant purchasers understand by the phrase "Made

in the USA," and that ICM's claim actually deceives or has a tendency to deceive them given the

actual facts about ICM's products.

     Instead Honeywell primarily relies on the opinion of Dr. Akshay Rao, who is a Professor

of Marketing at the University of Minnesota's Carlson School of Management.  *See* ECF No.

256-1: Ex. B.[16]  Honeywell cites Dr. Rao's opinion in which he says that "contractors," who the

---

[14]    The amended complaint only identifies the phrase "Made in the USA" as the basis for the Lanham Act claim of Count XVIII.  The ICM marketing materials included in Honeywell's submissions show variations of "100% American Made" and "American Made" in addition to references to "Made in the USA."  Honeywell does not draw a distinction between the different phrases and has not made any persuasive argument about why they should be treated differently.

[15]    The amended complaint does not allege willfulness or bad faith of the type referenced in *United Industries*, *see* 140 F.3d at 1182-83, in connection with Count XVIII and Honeywell has made no showing on the subject.

[16]    ICM filed a *Daubert* motion seeking to exclude the testimony of Dr. Rao.  His opinion is discussed here without regard to its admissibility, because even if it were admitted, Honeywell's evidence falls short of meeting the requisite standard.

parties treat as the relevant consumers, "are likely to believe" that a "Made in the USA" claim "implies that 100% of the product and its components are manufactured" in the United States. *Id.* ¶ 30.  As support, Dr. Rao cites the deposition testimony of Charisse Barber, which Honeywell also cites as evidence in its opposition to the present motion.  *Id.*; ECF No. 303/304 at 16.  Although not specifically identified, Ms. Barber appears to be involved in sales for Honeywell.  She testified to a discussion with a contractor or contractors about the meaning of "Made in the USA" and stated that "[t]hey believe that the product is, you know, ultimately a hundred percent made in – in the United States, all of its components are made here."  ECF No. 305-3: Ex. 13 at 98-99.  After referring to ICM's promotional efforts, Dr. Rao concludes that based on ICM's claims "contractors are likely to infer that 100% of the product, parts and labor are manufactured" in the country.  ECF No. 256-1: Ex. B ¶ 30.  Honeywell, however, has not made any showing that Dr. Rao conducted any research of actual contractors or that he has any relevant experience with such contractors.  He only theorizes about what contractors "are likely to believe" and "likely to infer."  *Id.*  Dr. Rao's testimony, even combined with Barber's deposition testimony, does not amount to "reliable consumer or market research" on what contractors understand by the phrase "Made in the USA" and whether they would find ICM's use of that phrase for its products misleading.

Honeywell also points to studies by the FTC about general consumers' perception of the phrase in connection with its 1997 Policy Statement.  But those studies, performed in 1991 and 1995, *see* Request for Public Comment on Proposed Guides for the Use of U.S. Origin Claims, 62 Fed. Reg. 25,020, 25,035-37 (May 7, 1997), cannot get Honeywell over the summary judgment hurdle since they do not address what a contractor in the present-day understands by the phrase and whether that understanding is inconsistent with ICM's use of it.  Moreover, in

summarizing its conclusions based on those various studies, the Commission found that "the consumer perception data indicate that many consumers may have only a general sense of what the phrase 'Made in USA' means rather than a highly refined view of how 'Made in USA' should be interpreted, i.e., whether a 'Made in USA' claim should be evaluated in terms of costs, processing, or in another manner." *Id.* at 25037.  The FTC Policy Statement itself acknowledges that beyond the minimum threshold requirement of final processing or assembly in the country, a customer's understanding of the accuracy of a U.S. origin claim would depend on the product and the type of content that was foreign sourced.  Thus, the FTC material does not amount to market evidence by which ICM can establish its Lanham Act claim.  Honeywell lacks sufficient evidence of deception from the relevant consumer group about the relevant products for the Court to allow Honeywell to proceed with its claim for false designation of origin.  Count XVIII must be dismissed.  *See Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390 (8th Cir. 2004) (confirming that "[t]he failure to establish any element of the prima facie case is fatal").

### 3. ICM's Motion for Summary Judgment on Honeywell's Trade Dress Infringement Claims

ICM seeks summary judgment on four counts of the amended complaint in which Honeywell alleges infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), of its trade dress interests in four control products.  Provided that the requisite conditions are met, the Lanham Act creates protection for a product's "trade dress," which encompasses the packaging or "dressing" of a product as well as its design.  *See TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 28 (2001).  Protected trade dress may be registered or unregistered.  *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 209-10 (2000).  Honeywell's claimed trade dress for each of its four products is unregistered.  To establish a claim for

unregistered trade dress infringement, a plaintiff must demonstrate that the claimed trade dress

(1) is distinctive; (2) is nonfunctional; and (3) its imitation would likely cause confusion for

consumers as to the source of the product. *Gateway, Inc. v. Companion Prods.*, 384 F.3d 503,

507 (8th Cir. 2004).  ICM contends that Honeywell cannot meet its burden of establishing the

nonfunctionality of its claimed trade dress.

Images of the four Honeywell products[17] at issue are shown below:




S8610U                                   S8910U




R8184                                   R7184

For each Honeywell product that forms the basis for the trade dress claims, the amended

complaint alleges that the product "has a distinct look and feel that includes without limitation

the following elements, either alone or in combination:" and lists a series of elements.  ECF No.

---

[17]      The controls are installed on a 4 inch by 4 inch junction box.

32 ¶¶ 33, 52, 65, 81.  Honeywell's brief opposing ICM's motion on the trade dress claim initially characterizes the trade dress for each product as being comprised of the same set of elements "either alone or in combination."  *See* ECF No. 310/311 at 1-6.  By the end of the brief, however, it is unclear whether Honeywell asserts a trade dress interest in anything less than a combination of the listed elements.  *See id.* at 22-23.  At the hearing on the motion, Honeywell confirmed that its claimed interest is in the combination of the identified elements.

The elements identified in the amended complaint and briefing for each of the four products are similar in nature.  As a representative example, the elements listed for the R8184 are as follows:

- a gray case;
- a raised and ridged circular bezel formed out of the case, located on the left side of the "face" of the product;
- a red circular reset button set inside the raised/ridged bezel;
- a black-and-white label with an orange warning bar immediately to the right of the red button;
- an LED indicator light nestled in the housing and located between the thermostat and flame-sensor connections along the right side of the unit; and
- the location and order of the thermostat and flame sensor quick-connect terminals on the right side of the unit.

ECF No. 32 ¶ 52; ECF No. 310/311 at 4-5.

At the outset, the Court acknowledges the striking similarity between the Honeywell products at issue and the corresponding ICM products that Honeywell alleges infringe its trade dress.  As an example, the Honeywell R8184 and the ICM counterparts are shown below:

  

Honeywell R8184                    ICM 1500 Series

But "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix*, 532 U.S. at 29. And, as a general matter, "unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying."[18] *Id.* The Supreme Court has also cautioned against misuse or over-extension of trade dress. *Id.* Particular caution is warranted when extending protection to product designs and configurations. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114-15 (2d Cir. 2001); *see also Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 873 (8th Cir. 1994) ("Our society is better served if functional containers (as well as product designs and highly descriptive or generic terms) remain available for use among competitors. To the extent this causes a modicum of confusion of the public, it will be tolerated.") (quoting *In re Water Gremlin Co*., 635 F.2d 841, 844 (C.C.P.A. 1980)); *Leatherman Tool Group, Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999) ("Several other courts have noted that it is, and should be, more difficult to claim product configuration trade dress than other forms of trade dress.").

The Lanham Act assigns the party asserting trade dress protection the burden of

---

[18]    The present complaint includes both patent and copyright claims related to some of the same products that are the subject of the trade dress infringement claims.

establishing that unregistered trade dress is not functional.  *See* 15 U.S.C. § 1125(a)(3); *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co*., 668 F.3d 677, 683 (9th Cir. 2012) ("Under the Lanham Act, Congress imposes a presumption of functionality, and plaintiff bears the burden of proving nonfunctionality.").  The line between functionality and nonfunctionality "is not brightly drawn." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1203 (11th Cir. 2004) (internal quotation marks omitted); *see also Eppendorf-Netheler-Hinz Gmbh v. Ritter Gmbh*, 289 F.3d 351, 355-56 (5th Cir. 2002) (observing that "the definition of 'functionality' has not enjoyed such clarity").  In *TrafFix* the Supreme Court provided some guidance on the subject.  It confirmed that the "traditional rule" on functionality continues to apply.  *TrafFix¸* 532 U.S. at 33-35.  That rule, articulated in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982), provides that "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."

In *Qualitex Co. v. Jacobson Products Co*., 514 U.S. 159, 165 (1995), the Supreme Court expanded on the language from *Inwood*, saying "'in general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."  The appellate court decision under review in *TrafFix* had incorrectly interpreted the additional *Qualitex* language regarding a "non-reputation-related disadvantage"—at times referred to as the "competitive necessity" test— as creating a "necessary test" for, or a "comprehensive definition" of, functionality.  *TrafFix*, 532 U.S. at 32-33.  In reversing the appellate court, the Supreme Court confirmed that *Qualitex* did not change the traditional nonfunctionality inquiry and "competitive necessity" is a proper

consideration in cases of "aesthetic functionality."[19]  *Id.*; *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 505-07 (6th Cir. 2013).

Reading *TrafFix* and *Qualitex* together confirms that "the test for functionality proceeds in two steps." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006); *accord Louboutin v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 219-20 (2d Cir. 2012). First, the traditional nonfunctionality inquiry as stated in *Inwood* is made. If no functionality is found under it, a second inquiry is made as to whether competitors would nonetheless be at a significant non-reputation-related disadvantage. *See TrafFix*, 532 U.S. at 32-33. But "[w]here the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.*

Consistent with the treatment of the concept by other courts, the Eighth Circuit has traditionally used the notion of an "arbitrary embellishment" when discusing the concept of nonfunctionality of trade dress. *See Gateway*, 384 F.3d at 508. More specifically, the notion is that "trade dress is nonfunctional 'if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality. But if the trade dress is an important ingredient in the commercial success of the product, it is clearly functional.'" *Id.* (quoting *Prufrock, Ltd. v.*

---

[19]     In *TrafFix* the Supreme Court characterized *Qualitex* as involving an aesthetic functionality inquiry. *TrafFix*, 532 U.S. at 33. The claimed trade dress in *Qualitex* was for a green-gold color of press pads used in dry cleaning presses and the main question under consideration was whether the Lanham Act permits a color to serve as a trademark. *Qualitex*, 514 U.S. at 160-62. Even though the green-gold color did not have "any bearing on the use or purpose of the product or its cost or quality," *see TrafFix*, 532 U.S. at 33, the defendant had raised a concern that allowing color to be protected created a risk that if various competitors were allowed to use different colors as trade dress, the supply of usable colors would be depleted such that other competitors would be at a significant disadvantage, *see Qualitex*, 514 U.S. at 168. The Supreme Court rejected that argument on the ground that the trademark doctrine of "functionality" would protect against the risk, *id.* at 169-70, and ultimately confirmed trade dress protection for the green-gold color at issue, *id.* at 174, presumably because the nature of the color did not present a "color depletion" problem.

*Lasater*, 781 F.2d 129, 133 (8th Cir. 1986)); *see also Eppendorf-Netheler-Hinz*, 289 F.3d at 355

("[T]rade dress protection extends only to incidental, arbitrary or ornamental product features

which identify the source of the product."); *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150,

158 (6th Cir. 2003) ("[I]n order to receive trade dress protection for the overall combination of

functional features, those features must be configured in an arbitrary, fanciful, or distinctive

way.").

      For each controller product, a review of the elements identified by Honeywell as making

up its trade dress shows that they relate to certain characteristics of components on the external

body of the controllers.  There does not appear to be any dispute that the components themselves

serve a function.  For example, for the R8184, the case serves to protect the internal components,

the reset button is used to reset the device, the raised bezel protects the button, the label provides

information (including manufacturer identity) or warnings, and the LED light operates as an

indicator.  For each product, Honeywell witnesses confirmed that all of the external components

have a function.  ECF No. 263: Ex. A at 81:13-82:18 (R7184), Ex B at 67:5-10 (R8184), Ex. C at

78:4-88:20 (S8910U), 89:4-98:14 (S8610U).  But what Honeywell contends forms its trade dress

is not the components in and of themselves, but certain characteristics, such as the gray color of

the case, the red color of the reset button, and the location relative to each other of the various

components on the external body of the unit.  All of the elements identified by Honeywell for

each of the four products at issue can be categorized as relating to shape, color, or configuration.

Thus the question before the Court is whether Honeywell has proffered sufficient evidence from

which a reasonable jury could find that it has met its burden of overcoming the presumption of

functionality of its claimed trade dress at both stages of the requisite inquiry.

A. <u>Is the claimed trade dress essential to the use or purpose of the product or does it affect the product's cost or quality?</u>

For the shapes, colors, and configurations of its products, Honeywell has not made a showing that they are not functional under the traditional *Inwood* test—that the claimed trade dress is not essential to the use or purpose of the product and does not affect its cost or quality. Instead, Honeywell has focused exclusively on the competitive necessity approach, and has sought to establish the availability of alternative design choices. While the existence of alternative designs may still be relevant to the primary inquiry of functionality, *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002), *TrafFix* makes clear that treating the competitive necessity test as the sole and comprehensive gauge—without consideration of the purpose, use, cost, and quality aspects relevant to the primary inquiry—is error. But that is what Honeywell has done.

In its brief, Honeywell quotes the formulation of the nonfunctionality standard from *Qualitex* and uses the reference to an absence of a "significant non-reputation-related disadvantage" to frame its argument and presentation of evidence. *See* ECF No. 310/311 at 17. Honeywell first proffers testimony of its witnesses that repeatedly uses the buzzword "arbitrary" in describing the shape, color, and configuration of its products. *See id.* at 1-6. But a review of the cited testimony shows that the witnesses consistently used the term "arbitrary" to merely mean that multiple options exist for the particular shape, color, or configuration at issue. For the S8610U and S8910U products, Honeywell relies on the testimony of its corporate witness, John Cueva, that various features are "arbitrary." *Id.* at 2-4. Mr. Cueva confirmed that when he used the term "arbitrary features," he meant that "they could have readily been designed differently." ECF No. 312-4 at 45-46. For the R8184 and R7184, Honeywell primarily relies on the testimony of another corporate witness, Richard Simons. ECF No. 310/311 at 4-6. He also used

the term "arbitrary" and his testimony shows he meant that it was merely not a necessary design choice and other options existed. *See* ECF 312-10 at 319 ("It's red, arbitrary as well. It could have been located in different areas. It could have been different colors.").

Honeywell next contends that "ICM's experts agree competitors would not be at a 'significant non-reputation-related disadvantage' by not using the trade dress." ECF No. 310/311 at 6-7. In support, it cites testimony of an ICM expert that the appearance of the control products at issue does not influence customer demand. Honeywell also cites the testimony of an ICM corporate witness that confirms the potential for alternative designs as long as they meet the "form, fit and functional" constraints of serving as a replacement control. *Id.* Again, the testimony shows no more than the possibility of alternative designs. Moreover, the expert's statement that the external appearance of the product does not drive consumer demand confirms what the plain appearance of the devices suggest—that they are nondescript pieces of technical equipment, purchased solely for the function that they serve. That fact cuts against a finding of nonfunctionality of the product design. *See Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 516 (9th Cir. 1989) ("If the utilitarian aspects of the product are its essence, only patent law protects its configuration from use by competitors.").

Honeywell then points to the testimony of two of its own expert witnesses on nonfunctionality. But those experts also opine primarily on the competitive necessity of the designs under the *Qualitex* formulation, without reference to the requisite use, purpose, cost, and quality considerations. The first paragraph on nonfunctionality in the expert report of David Schumacher states:

> The external appearance of the Honeywell controls is not "functional." A competitor with a differently-shaped enclosure would not be at a non-reputational-related disadvantage for using its own appearance of a combustion control rather than Honeywell's.

ECF No. 312-17 ¶ 175.  In his reply expert report, Mr. Schumacher states that he has "been

informed that a functional feature is one the exclusive use of which would put competitors at a

significant non-reputation-related disadvantage."  ECF No. 312-18 ¶ 12.  While he lists other

legal principals related to functionality, such as those referring to an "arbitrary flourish" or

"arbitrary, incidental, or ornamental aspects," he does not refer to the primary standard of

whether the asserted trade dress is essential to the purpose and use of the products and whether it

affects their cost or quality.  *Id.* ¶¶ 13-15.

    The rebuttal report of another Honeywell expert, Mr. Thomas Gafford, states the same

definition of a functional feature and other similar legal principles as Mr. Schumacher's report,

but also omits the main inquiry.  ECF No. 312-20 ¶¶ 53-58.  The submitted portion of Mr.

Gafford's initial expert report does not identify the legal principles applied or the meaning used

for the terms "arbitrary" and "nonfunctional" in reaching his opinion that those terms describe

Honeywell's product designs.  ECF No. 312-19 ¶¶ 134-180.  But after conclusory statements that

the shape, color, and configuration aspects of the products are "arbitrary and nonfunctional" and

there is no "technical or functional need" for ICM's products to have the same shape, color, and

configuration details, *id.* ¶¶ 135-43, the discussion in his expert report on nonfunctionality

confirms that his approach is consistent with Honeywell's overarching approach of establishing

the availability of alternative designs to attempt to meet its burden on nonfunctionality, *id.* ¶¶

144-80.  He points out replacement controllers from other manufacturers that can be used like the

products at issue but that have different external appearances, points out ICM's alternative

designs, and points to hypothetical alternative designs of cases that ICM could use.  *Id.*  He

observes that the availability of these different sets of "alternative designs demonstrate the

arbitrary nature of the shape of Honeywell and ICM's products."  *Id.* at 102, 105-106.  Thus,

Honeywell's experts, like its other witnesses, gauge nonfunctionality based on the availability of alternative designs.

Honeywell lastly proffers the evidence of other competitors' controls that do not appear as similar to its products as ICM's products do, but that are functionally interchangeable. ECF No. 310/311 at 10-16. Honeywell points to this evidence of "myriad competitive controls that exhibit a wide variety of trade dress" as demonstrative of the nonfunctionality of Honeywell's designs. *Id*. at 16. But again that evidence only shows the possibility of other designs.

Thus, Honeywell's entire submission to meet its burden on nonfunctionality is directed at establishing that competitors would not be at a "significant non-reputation-related disadvantage" if its claimed trade dress were protected. The approach effectively treats the competitive necessity test as a "comprehensive definition" of functionality. But *TrafFix* confirms the inappropriateness of that treatment.[20]

---

[20]     In *Insty\*Bit v. Poly-Tech Indus*., 95 F.3d 663, 673-74 (8th Cir. 1996), the Eighth Circuit determined that the use of alternative designs for a "quick-change drill chuck" by competitors could support a nonfunctionality determination under the facts of that case, such that the question should have gone to a jury. The primary focus of the opinion, however, was the district court's treatment of the "likelihood of confusion" element of the trade dress claim and nonfunctionality is summarily addressed in a single paragraph. But more importantly, *Insty\*Bit* predates the Supreme Court's opinion in *TrafFix*. The appellate decisions since *TrafFix* that discuss functionality in the context of trade dress claims analogous to those asserted by Honeywell here consistently show that a mere combination of functional components with nondescript or common colors, shapes, and configurations does not meet the requisite standards. *See, e.g.*, *Groeneveld*, 730 F.3d at 504-505 (overall appearance of a grease pump); *Secalt S.A.*, 668 F.3d at 681-83 (external design elements of a traction hoist); *Eppendorf-Netheler-Hinz*, 289 F.3d at 353-354 (external elements of disposable pipette tips). While the *Groeneveld* and *Eppendorf* opinions specifically discuss evidence of the functions served by the design elements at issue, they are decisions overturning jury determinations of nonfunctionality, i.e. they were rendered after jury trials in which both sides presented evidence. *Groeneveld*, 730 F.3d at 505; *Eppendorf-Netheler-Hinz*, 289 F.3d at 357-58. Here ICM had no burden to come forward with evidence of functionality of the design elements. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (confirming that summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" even in the absence of an affirmative

Critically missing from the evidence that Honeywell puts forward in its opposition to ICM's motion is a demonstration that its claimed trade dress is not essential to the use or purpose of the products and does not affect their cost or quality.  While Honeywell emphasizes the interchangeability of other competitors' designs, ECF 310/311 at 9-16, and points to the "feasibility" of alternative designs, *id*. at 7, it does not put forward evidence that those designs do not have cost or quality consequences that the Honeywell designs avoid.[21]   While Honeywell includes a reference to the testimony from an ICM witness that a redesigned mold for the cases for the relevant ICM controllers would range from $12,500 to $20,000, ECF 310/311 at 7-8, those figures say nothing about how the costs to actually make, store, ship,[22] or otherwise process the reshaped cases would compare to the same costs for the Honeywell designs. Honeywell similarly cites the reference in Mr. Schumacher's report to the same ICM testimony, but the expert only confirms that it would not be expensive to shift to a new shape.  He says nothing about how the actual manufacturing and other costs of a differently-shaped product would compare to the Honeywell design.  ECF No. 310/311 at 8; ECF No. 312-17 ¶ 201. Honeywell also does not put forward any evidence that the design elements were selected with an eye to identification and individuality rather than utility. The failure to proffer evidence that meets the primary nonfunctionality inquiry warrants summary judgment.

---

showing of evidence from the nonmoving party negating the element); *see also Secalt*, 668 F.3d at 686 (observing the absence of "any evidence that these functional aspects of the trade dress were adorned with arbitrary, ornamental embellishments" in affirming summary judgment for failure to establish nonfunctionality).

[21]   During his deposition as a Honeywell corporate witness, Mr. Cueva testified that "typically our standardized designs are our lowest cost designs."  ECF No. 263: Ex. C at 93:2-4. Honeywell does not proffer any evidence on whether or not its designs at issue are lowest cost or represent design choices that actually increase costs.

[22]   For example, some of the hypothetical designs for the controller housings proposed by Honeywell change a straight length to a rounded shape.  *See* ECF No. 312-19 at 106-107.  It seems likely that storage and transport space would be more efficiently utilized with a straight rather than curved edge such that the hypothetical design could be costlier.

Moreover, common experience confirms the functionality of many of the elements that make up Honeywell's claimed trade dress.  For example, although alternatives may be possible, black and gray are common choices for housings for technical equipment, especially equipment meant to be in the background, so that they do not stand out.  *See Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531-32 (Fed. Cir. 1994) (confirming the functionality of the use of black for boat engines as the color black "exhibits both color compatibility with a wide variety of boat colors and ability to make objects appear smaller" and distinguishing that use of a color from the nonfunctional use of pink for fibrous glass insulation).  Likewise, the red of stop signs and orange of road-work signs suggest that those colors help draw attention, so their use for an important button or warning label serves a function.  Common sense also suggests manufacturing, storage, and transportation efficiencies of simple shapes, such as a generally rectangular shape for the overall product or for a round button.

Additionally, the evidence proffered reflects that some constraints for the product designs are created by where the controllers are mounted, the wiring needed, and the install space.  *See* ECF 310/311 at 7.  Honeywell has not put forward evidence of the nature of the space, mounting, and wiring requirements, such that a fact-finder could determine that those constraints do not make its product configurations and shape functional.  By focusing solely on showing that alternative designs are possible, Honeywell has avoided the primary nonfunctionality inquiry.  But the controllers at issue are little more than a set of "individual functional components" that have been "combined in a nonarbitrary manner to perform an overall function." *Groeneveld*, 730 F.3d at 505.  In such a scenario, "the producer cannot claim that the overall trade dress is nonfunctional." *Id.*; *Secalt*, 668 F.3d at 684 (noting that the plaintiff's "fundamental misunderstanding—which infects its entire argument—is that the

presumption of functionality can be overcome on the basis that its product is visually

distinguishable from competing products").  Summary judgment against Honeywell is

appropriate.

     B.  <u>Would competitors be at a significant non-reputation related disadvantage?</u>

     Even if the Court were to assume that Honeywell had actually proffered sufficient

evidence that the claimed design elements were not essential to the use or purpose of the

products and did not impact their cost or quality, Honeywell cannot meet its burden to show that

the basic colors and shapes, as well as their nondescript combination do not put competitors at a

non-reputation related disadvantage.  *See Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 860

(7th Cir. 2010) ("Granting a producer the exclusive use of a basic element of design

(shape, material, color, and so forth) impoverishes other designers' palettes.").  While shape,

color, and configuration may certainly qualify as valid marks, the types of shapes, colors, and

configurations claimed by Honeywell differ fundamentally in nature from those in cases where

protection was found or considered a possibility.  The eccentric use of green-gold on a laundry

press pad, *Qualitex*, 514 U.S. at 160-61, the unexpected placement of red on a shoe's outsole that

contrasts with the upper part, *Louboutin*, 696 F.3d at 227-28,[23] or the purposefully-striking

contours of a Ferrari, *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d

1235, 1246 (6th Cir. 1991), are sufficiently unusual or "arbitrary"[24] that preventing others from

---

[23]     In *Louboutin*, the Second Circuit declined to address the functionality of the design, but
implicitly left open the possibility of its nonfunctionality.  696 F.3d at 228.

[24]     While Honeywell's witnesses all describe the shape, color, and configuration of its
products as "arbitrary," the Lanham Act cases show that their use does not correspond to the way
the cases use the term in connection with the doctrine of functionality.  Rather, the reference to
"arbitrary" in the cases is linked to the concept of a design element "primarily adopted for
purposes of identification and individuality."  *See Gateway, Inc.*, 384 F.3d at 508.  The type of
trade dress at issue in *Qualitex*, *Louboutin*, and *Ferrari* confirms that "arbitrariness" in the
context of the doctrine of functionality refers to design elements purposefully introduced not for

copying those elements may not pose an unfair disadvantage to competitors.  In contrast, although Honeywell has shown that design variations are possible, it has not shown that they are sufficiently great in number—especially in light of the size, installation space, and wiring constraints for controllers—that they would not significantly disadvantage competitors.

Rather than establishing the absence of a competitive disadvantage, the materials before the Court raise concerns about the foreseeable disadvantages from recognizing trade dress protection of the sort Honeywell requests.  For example, while Honeywell relies on the closeness of the resemblance between Honeywell's and ICM's products and introduces images of other competitors' products that differ, some do not differ so significantly as to make it clear that no concern of an infringement claim would exist.  The images of Honeywell's S8610U with the corresponding ICM product and some of the products of other competitors that Honeywell submitted show that the level of differentiation in appearance varies:



any utilitarian purpose but rather to distinguish the product.  *See also Gateway Inc.*, 384 F.3d at 508 (black and white cow spots on computers); *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1003, 1007 (8th Cir. 2005) ("Safety Clown graphic" on an ice cream truck).

Even for the hypothetical alternatives to ICM's designs that Honeywell's expert, Mr. Gafford, created, he disclaims any "opinion as to whether or not these would be acceptable to Honeywell as a matter of trade dress protection." ECF No. 312-19 ¶¶ 163, 165.

To accept Honeywell's contention that it is entitled to the trade dress protection it seeks for the basic shapes, colors, and configurations of the undeniably functional components of its controller products just because other shapes, colors, and configurations exist, would mean that the overall appearance of practically any everyday appliance or piece of generic equipment would meet the nonfunctionality test, because as long as the item is large enough or has at least a few external components, some variation in the configuration is bound to be possible. And if Honeywell's design qualifies for trade dress protection, then so would analogous unregistered designs belonging to other competitors. It does not take much stretching to envision the undue burden that new entrants would then face to steer clear of the first few such combinations to receive protection.[25] That burden seems especially onerous when imposed on suppliers of technical equipment for mundane applications that are purchased almost exclusively, if not entirely, for the functionality that they provide. This is exactly the type of scenario in which the protections of the "competitive necessity" prong of the functionality doctrine come into play. *See Valu Eng'g*, 278 F.3d at 1277 (noting that "the effect upon competition is really the crux of the functionality inquiry") (internal quotation marks omitted). When functional components are merely pulled together in a nondescript manner, the fact that they do have an appearance and that other appearances are possible, is not sufficient by itself to support a determination of nonfunctionality. Honeywell's controllers certainly have "an exterior appearance, as every

---

[25] For example, if Honeywell can protect having the "thermostat and flame sensor quick-connect terminals on the right side" of the R8184 unit, then other competitors would be forced to use one of the other three sides of a rectangular unit, and once those run out, other competitors would be at a serious disadvantage.

object must; but there is no evidence that anything about the appearance exists for any nonfunctional purpose." *See Secalt*, 668 F.3d at 684.

While the copying of the product of another's efforts might offend traditional sensibilities, as the Supreme Court has confirmed, it is generally acceptable in the absence of patent or copyright protection. *TrafFix*, 532 U.S. at 29; *see also Clamp Mfg.*, 870 F.2d at 516 ("The requirement of nonfunctionality is based 'on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be *temporarily* denied by the patent or copyright laws.'") (quoting *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1336 (C.C.P.A. 1982)). Moreover, a party may seek trade dress registration or a design patent and benefit from the presumptions they create in an infringement action. But here Honeywell bears the "heavy burden of showing" that its asserted unregistered trade dress "is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix*, 532 U.S. at 30. Summary judgment is appropriate in light of Honeywell's failure to come forward with sufficient evidence to do so.[26]

---

[26]   Counts XIII – XVI of Honeywell's amended complaint assert trade dress infringement under 15 U.S.C. § 1125(a)(1)(A). Count XVII alleges false advertising under subsection (a)(1)(B) of § 1125 based on the same facts and grievance that formed the basis for the trade dress infringement claim. In particular, Honeywell alleges that the "false impression, fostered by ICM, that ICM's products are in fact affiliated with, the same as, sponsored by, manufactured by or condoned by Honeywell is false" and therefore amounts to "false advertising" under subsection (a)(1)(B). The Court questions the propriety as a legal matter of asserting a claim that is in effect one for trade dress infringement under subsection (a)(1)(B) and of construing a product's appearance as a "statement of fact" that can form the basis for a claim under subsection (a)(1)(B). If Honeywell intends to pursue Count XVII further, it must submit a brief with legal authority for its position that Count XVII states a claim on which relief can be granted, within three weeks of the date of this order. ICM may make its own submission on the subject within two weeks from any such filing by Honeywell.

**4. Honeywell's *Daubert* Motion**

With its *Daubert* motion, Honeywell seeks exclusion of the testimony of three ICM experts: Robert Stein, Leon Kaplan, and Adam Vaczek.

A. <u>Mr. Robert Stein's report related to the false designation of origin claim</u>

Mr. Stein formerly worked as a United States Customs Broker and currently serves as Vice President of Customs and Trade Compliance at Mohawk Global Logistics. He submitted an expert report relating to Honeywell's false advertising claim based on ICM's marketing of its products as "Made in the USA." In light of the Court's dismissal of that claim, Honeywell's motion with respect to Mr. Stein will be denied as moot.

B. <u>Dr. Leon Kaplan's survey on heating, ventilation, and air conditioning ("HVAC")</u>
   <u>contractor purchasing behavior</u>

Dr. Kaplan of Princeton Research & Consulting Center, Inc. submitted a report at ICM's request that is titled "HVAC Contractor Purchasing Behavior Study." ECF No. 276-6: Ex. G. In responding to Honeywell's motion to exclude Dr. Kaplan's testimony, ICM represents that his study relates to "any equitable award of a disgorgement of profits, assuming trade dress infringement or false advertising, under 15 U.S.C. § 1117 or, assuming copying infringement, under 17 U.S.C. § 504(b)." ECF No. 307 at 32. With its motion, Honeywell mainly argues that Dr. Kaplan's conclusions drawn from his study are not grounded in any accepted principle of trade dress law. Honeywell also argues that Dr. Kaplan's opinions addressing the relative importance of HVAC contractors' product-purchasing considerations are not relevant to the trade dress, copyright, and "Made in the USA" false advertising claims. The dismissal of those claims other than the copyright claims has largely rendered Honeywell's motion moot. And since ICM does not seek to present the study to the jury, but to the Court in connection with the determination of any equitable damages award, Honeywell's arguments as to Dr. Kaplan's

opinions will not be considered at this time.  The part of Honeywell's motion directed at Dr.

Kaplan's testimony will be denied without prejudice.

      C.  <u>Mr. Adam Vaczek's proposed testimony related to the copyright infringement claims</u>

Mr. Vaczek submitted an expert report in connection with ICM's opposition to

Honeywell's claim that the installation manuals and product labels of ICM's accused products

infringe Honeywell's copyright interests.  ECF No. 276-1.  Mr. Vaczek has over 30 years of

experience in the HVAC industry, which is the relevant one for the products at issue.  As a

service technician for over 20 years, he worked on troubleshooting, repairing, and replacing

various types of HVAC equipment, including furnaces, boilers, and heaters.  In 2001 he became

the Service Manager for a large mechanical contractor.  He has had considerable experience

purchasing controls and extensive exposure to installation manuals and product labels in

connection with his work.

Mr. Vaczek's report has two sections.  In section A of his report, Mr. Vaczek states that

he has "been asked to provide [his] opinion regarding the content of certain Honeywell product

manuals and labels, namely whether they contain factual information necessary for contractor

use, methods of operation, standard industry concepts and words, or common directives that can

only be written a few ways."  *Id.* at 6.  He summarizes his opinion as follows:

> It is my opinion that Honeywell's manuals and labels for the controls at issue contain
> little, if any content that is unique to Honeywell or that is not determined by the features
> or functions of the controls themselves.  The organization of the information contained in
> the manuals and labels is standard industry information, common directives, fact-based
> communications, methods of operation and universally shared graphics.  Many of the
> instructions and methods, use simple ways to convey factual messages.

*Id.*

In the lengthy analysis portion of section A, Mr. Vaczek reviews the Honeywell manuals

and labels at issue.  For each manual, he describes the purpose, assesses the chapter headings,

and then analyzes the chapter content.  He generally concludes that the chapter headings and organization follow a format that is typical of other manufacturers and not "unique" to Honeywell.  He reviews the chapter content to conclude that the content is factual, is necessitated by the features or functions of the control, and contains concepts or language standard in the industry.  For each label, he describes the purpose and reviews the size, layout, and content to conclude that they are functional and standard in the industry.

In section B of his report, Mr. Vaczek states that he has "been asked to provide opinions regarding the differences and areas of intersection" between Honeywell and ICM's manuals and labels at issue.  *Id.* at 100.  He then goes on to consider each set of corresponding ICM and Honeywell materials to "identify differences and areas of intersection, and the reasons for these differences and areas of overlap."  *Id.*  For each set, he reviews the sections and identifies differences.  *Id.* at 100-142.  He also discusses the similarities to explain his opinion that they result from the features, functions, and mechanics of the products or are attributable to industry standards and best practices.

Honeywell makes three arguments in seeking exclusion of Mr. Vaczek's report.  First, Honeywell contends that because Mr. Vaczek does not consider himself a copyright expert and admitted that he would not be opining on copyrightability of the works, his report should be excluded.  Since an expert need not opine on the ultimate legal question at issue, the Court interprets Honeywell's challenge as directed at the relevance of Mr. Vaczek's proposed testimony.  Second, Honeywell contends that Mr. Vaczek's opinions are not grounded in any analysis of the "originality" of Honeywell's registered works.  Third, Honeywell contends that

because ICM did not provide any discovery on how the manuals were created, Mr. Vaczek should not be allowed to provide an explanation of why they resemble Honeywell's materials.[27]

In order to assess Honeywell's arguments, a review of the relevant copyright law is necessary. To establish copyright infringement, two elements must be proven: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id*. at 345. The infringement requirement of "copying" of original elements "may be established (1) by direct evidence or (2) by showing that the defendants had access to the copyrighted materials and showing that substantial similarity of ideas and expression existed between the alleged infringing materials and the copyrighted materials." *Rottlund Co. v. Pinnacle Corp*., 452 F.3d 726, 731 (8th Cir. 2006).

A determination of substantial similarity involves a two-step analysis, called the "extrinsic test" and the "intrinsic test." *Frye v. YMCA Camp Kitaki*, 617 F.3d 1005, 1008 (8th Cir. 2010). For the extrinsic test, "similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works." *Id.* If substantial similarity in ideas exists, then under the intrinsic test, "similarity of expression" is evaluated and depends on the "response of the ordinary, reasonable person to the forms of expression." *Id*.

The extent of similarity required may be impacted by the factual nature of the work, because a fact is not copyrightable in and of itself, although an original expression of a fact generally is copyrightable. *See Feist Publ'ns*., 499 U.S. at 349-50; *Applied Innovations, Inc. v.*

---

[27] The third argument does not raise a *Daubert* concern. Nonetheless, it is rendered moot by the limitation being placed on Mr. Vaczek's testimony and will not be addressed further.

*Regents of Univ. of Minn.*, 876 F.2d 626, 636 (8th Cir. 1989) ("Because authors who wish to express ideas in factual works are usually confined to a narrow range of expression, similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed.") (internal quotation marks omitted).  But "factual works" can encompass works that involve minimal creativity to ones that implicate considerable creativity, so the quantum of similarity needed varies accordingly.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 944 (10th Cir. 2002) (noting "the differences between 'sparsely embellished maps and directories' and 'elegantly written biography'").

Additionally, a copyrighted work may include elements that are not protected.  *Feist Publ'ns*, 499 U.S. at 348-49; *see also X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 609-10 (E.D. Va. 2001) (referring to individual elements of a copyrightable label that may not be protectable).  The doctrines of merger and *scenes a faire* may also limit the scope of protection.  *See Frye*, 617 F.3d at 1008 (describing the *scenes a faire* doctrine as limiting protection when "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic"); *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1212 (8th Cir. 1986) (explaining that under the doctrine of merger, "copyright protection will be denied to even some *expressions* of ideas if the idea behind the expression is such that it can be expressed only in a very limited number of ways"); *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1359-63 (Fed. Cir. 2014) (explaining both doctrines).

The substance of Mr. Vaczek's report is not admissible in its entirety.  In *Rottlund*, the Eighth Circuit confirmed that expert opinion evidence may be considered in connection with the extrinsic test for substantial similarity, because it "depends on such objective criteria as the type of artwork involved, the materials used, the subject matter, and the setting for the subject."  452

F.3d at 731.  But "[e]xpert opinion and analytical dissection are not appropriate to establish or rebut similarity of expression" under the intrinsic test.  *Id.*  Section B of Mr. Vaczek's report runs directly into this proscription on expert testimony stated in *Rottlund*.  It conducts an "analytical dissection" aimed at rebutting similarity of expression.[28]  *See, e.g.*, ECF 276-1 at 101 ("The visual impression of these two manuals is different."), 102 ("The chapters in the S8610U manual and sections in the ICM290 manual differ in length, width and layout."), 103 ("The ICM290 and Honeywell S8610U manuals contain different content and overlapping content is presented differently.").  While section B may contain some admissible content, it is too intertwined with the impermissible content and will be excluded in its entirety.  Moreover, section A already largely covers that content and is admissible in relevant part.

Section A of the report contains material relevant to the question of the strength and scope of the protected elements in Honeywell's labels and manuals, including to the application of the merger and *scenes a faire* defenses pled by ICM[29] in its answer to Honeywell's amended complaint.  In particular, the section identifies various pieces of information that need to be contained in the manuals and labels in light of the product functions, product features, and industry expectations.[30]  This information is especially relevant as some of the registrations of the items at issue reflect that the copyright interest is in the compilation of the information.  Section A of the report also identifies the content that is factual in nature.  While the factual

---

[28]    ICM generally contends that Mr. Vaczek's testimony is relevant to the extrinsic test.  But the analysis in section B only identifies differences in how the content is displayed or presented, i.e. in the expression of the content.

[29]    Although the typical scenarios in which *scenes a faire* is raised differ from the present context, the question of the applicability of the doctrine here has not been presented to the Court.  The determination of relevance is based on the pleading of the defense.

[30]    Honeywell notes that Mr. Vaczek could not identify any formal industry standards that apply.  Industry conventions, even in the absence of formal standards, might be relevant to the *scenes a faire* considerations.  Nonetheless, the absence of such standards is a legitimate factor to be considered and may be a shortcoming that can be exposed in cross-examination.

nature of a work does not preclude copyright protection, it may affect the strength and scope. Mr. Vaczek's experience gives him specialized knowledge about the functional, technical, and other requirements for content included on the labels and in the manuals at issue, which will be helpful to the jury.  In light of the applicable legal principles discussed above, section A of the report includes content that passes muster under *Daubert*.

But the section also consistently includes statements to the effect that there are "limited ways" to say something, the words used are "simple ways to convey the message," or the language uses the "most basic words."  *See, e.g.*, 276-1 at 10, 12, 14.  Honeywell points out that Mr. Vaczek lacks any experience drafting manuals or labels.  While he may have reviewed many such materials, his credentials do not reflect any special expertise in matters of linguistics. Accordingly, while he may share his knowledge about the necessity and typicality of particular content, including whether technical characteristics are generally expressed in a particular manner, he may not opine on whether there are limited forms of expression for the content or whether a particular expression is the most basic or simple one.

Finally, the Court agrees with Honeywell that the manner in which Mr. Vaczek's report uses the term "unique" and the extent to which the factual nature of the material is emphasized create some risk of misleading the jury as to the applicable legal standards.  But that risk will be more appropriately managed through the use of proper jury instructions rather than exclusion of his testimony in its entirety.  ICM's counsel is forewarned that the Court will be vigilant as to the manner of presentation of Mr. Vaczek's testimony.

### 5.  ICM's *Daubert* Motions

ICM filed four *Daubert* motions.  Each will be considered in turn.

A.   Dr. Akshay Rao's report for the false designation of origin and trade dress claims

ICM seeks to exclude the testimony of Dr. Akshay Rao, a professor of marketing at the University of Minnesota's Carlson School of Business.  He submitted an expert report in which he describes his "assignment" as opining on whether a product's visual characteristics could result in customer confusion about the company of origin, whether a "Made in the USA" claim could influence customer preferences and purchase decisions, and whether a market survey is necessary to establish valid conclusions on either of those topics.  The dismissal of the relevant trade dress and false advertising claims renders his proposed testimony moot.  As such, ICM's motion will be denied.

B.   Professor Justin Hughes proposed testimony related to the copyright claims

ICM seeks to exclude the testimony of Professor Justin Hughes, who provided an expert report in response to Honeywell's request that he "review and respond" to the report of ICM's expert, Adam Vaczek.  ECF No. 230-1 at 3.  Professor Hughes is a professor of law at Cardozo Law School, where he teaches various copyright and other courses.  Professor Hughes has impressive qualifications in and experiences with intellectual property law, including serving as an Attorney-Advisor in the U.S. Patent and Trademark Office and as a Senior Advisor to the Under Secretary of Commerce for Intellectual Property at the U.S. Department of Commerce.

Professor Hughes' report evaluates Mr. Vaczek's report from the perspective of what he considers to be the applicable legal standards.  In section II of his report, the first substantive section, Professor Hughes explains that Honeywell's manuals and labels are registered and then discusses the law that creates a presumption of copyrightability for registered works and the standards that must be met to overcome the presumption.  *Id.* at 3-6.  In section III of his report, he reviews the law to confirm that manuals and labels are categories of works protectable under

50

copyright law.  *Id.* at 7-8.  Section IV discusses particular aspects of Mr. Vaczek's report to argue that none of them preclude copyrightability of the manuals and labels at issue.  In particular, he explains that (1) facts and data do not prevent copyrightability; (2) analysis of "concepts" is not relevant to copyrightability; (3) "uniqueness" is not relevant to copyrightability; and (4) use of common expressions and terms do not prevent copyrightability. *Id.* at 9-16.  Section V explains copyright law's "merger" doctrine and argues why the content in Mr. Vaczek's report does not or should not actually result in a determination of merger.  *Id.* at 16-20.  Finally, section VI of the report argues why the content in Mr. Vaczek's report does not or should not establish a fair use defense.  *Id.* at 20-22.

ICM objects to Professor Hughes' proposed testimony as impermissibly directed at advising the jury on matters of the applicable copyright law and its application.  An elemental and established procedural tenet applicable to jury trials is that "the law is given to the jury by the court and not introduced as evidence" and it is "the function of the jury to determine the facts from the evidence and apply the law as given by the court to the facts as found by them from the evidence."  *See United States v. Gleason*, 726 F.2d 385, 388 (8th Cir. 1984); *see also United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) ("As a general rule, 'questions of law are the subject of the court's instructions and not the subject of expert testimony.'").  Although Federal Rule of Evidence 704(a) confirms that expert testimony is not objectionable merely because it "embraces an ultimate issue," a court "must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion."  *Robertson v. Norton Co.*, 148 F.3d 905, 908 (8th Cir. 1998) (internal quotation marks omitted).

Honeywell contends that Professor Hughes' report merely states his understanding of the law that guides his analysis of Mr. Vaczek's report and he does not intend to instruct the jury on the law.  But the analysis that Professor Hughes proffers is inextricably linked with his articulation of the nature of copyright law and his opinion about its correct application.  The entire thrust of his analysis is an identification of the copyright law that should apply and an assessment that Mr. Vaczek's opinions disregard the law or are irrelevant in light of it.  To allow him to testify in the manner proposed by his report would be to allow him to impermissibly invade the province of the Court and the jury.

Stated another way, the proposed testimony does not meet the expert-qualification and helpfulness requirements of Federal Rule of Evidence 702.  While Professor Hughes undoubtedly has significant legal expertise, that expertise alone cannot qualify him to testify on questions at issue in this case.  *See Gable v. NBC*, 727 F. Supp. 2d 815, 833-35 (C.D. Cal. 2010) (excluding Professor David Nimmer's testimony on substantial similarity because he was not a literary expert, despite being an eminent copyright expert).  Honeywell has not shown that Professor Hughes has HVAC technical or industry expertise such that he might challenge Mr. Vaczek's opinions about the extent to which functional and other requirements drive the content of the manuals and labels at issue.  Neither has Honeywell shown that he has expertise related to technical writings that may be relevant.  Moreover, his report does not suggest that he would testify on any topics other than the alleged legal impropriety or irrelevance of Mr. Vaczek's testimony.  But it is the Court's role to advise the jury about the applicable law and to police the acceptability of other experts' testimony.  Once Professor Hughes' proposed testimony on those subjects is excluded, his report does not have much that he would offer the jury.  Exclusion of his testimony is warranted.

C. Mr. Carl Degen's reasonable royalty opinions for the patent infringement claims

Mr. Degen provided an expert report addressing his opinions on the reasonable royalties to which Honeywell would be entitled for ICM's alleged infringement of the asserted Honeywell patents. ICM seeks to exclude those opinions. ICM primarily contends that Mr. Degen's reasonable royalty analysis fails to meet the *Daubert* standards because it violates the so-called "entire market value rule."

Upon a showing of infringement, a patentee is entitled, at a minimum, to a reasonable royalty in damages. *See* 35 U.S.C. § 284. A reasonable royalty calculation entails multiplying a royalty base—the "revenue pool implicated by the infringement"—by a royalty rate—the "percentage of that pool 'adequate to compensate' the plaintiff for that infringement." *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y 2009). "Where small elements of multi-component products are accused of infringement," using the revenues for the entire product as the royalty base entails "considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Therefore, generally royalties are not based "on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Id.* (quoting *Cornell Univ.*, 609 F. Supp. 2d at 283, 287-88). "The entire market value rule is a narrow exception to the general rule that royalties are awarded based on the smallest salable patent-practicing unit." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013). Under the rule, a patentee may use the revenues of "an entire multi-component product," if it can demonstrate "that the patented feature drives the demand" for the whole product. *LaserDynamics*, 694 F.3d at 67; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (explaining the background and history of the entire market value rule).

The products accused of infringing Honeywell's four patents are a thermostat product and some of the ICM gas ignition and oil primary control products.  ICM contends that Mr. Degen's analysis violates the entire market value rule, because he used the entire value of the accused products without considering whether the patented features drove demand for the whole product.  But the entire market value rule is a "narrow exception" to the "smallest salable patent-practicing unit" rule.  *LaserDynamics*, 694 F.3d at 67.  Honeywell contends that the accused thermostats and controls are the smallest salable patent-practicing unit. While it is Honeywell's burden to sufficiently tie a damages expert's testimony to the facts of a case, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011), and it must establish the admissibility of expert testimony by a preponderance of the evidence, *Daubert*, 509 U.S. at 593 n.10, the Court concludes that Honeywell has done so.  Honeywell has adequately shown that Mr. Degen's analysis is not deficient for treating the accused products as the smallest salable patent-practicing unit rather than as a multi-component product subject to the entire market value rule.  *See* ECF No. 299 at 10-13 (describing the patents at issue and their relationship to the accused products).

Although ICM challenges Honeywell's assertion that the accused products constitute the smallest salable patent-practicing unit, ICM has not identified a smaller component within the accused products that should be deemed to practice the invention such that use of the whole product is so improper as to warrant exclusion.[31]  Neither is any such smaller component readily apparent.  The absence of a readily-apparent severable component, whether physical or otherwise, distinguishes this case from those in which a violation of the entire market value rule

---

[31]     The accused thermostats appear to vary in terms of complexity and price.  For them ICM contends that Mr. Degen should have used the price of the most basic model in calculating the total royalty base.  ECF No. 268 at 4-5.  Honeywell's response articulates reasons for not doing so, and while the matter may be a dispute presented to the jury, the position adopted by Mr. Degen on it is not so unsupported as to warrant exclusion of his opinion.

has been found.  *See, e.g.*, *LaserDynamics*, 694 F.3d at 56-57, 68-69 (determining that a laptop could not form the royalty base, when an optical disc drive within the laptop infringed); *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1337 (Fed. Cir. 2009) (describing the infringing "date-picker tool in Outlook" as "but a very small component of a much larger software program"); *Imonex Servs. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1376, 1380 (Fed. Cir. 2005) (concluding that infringement by a coin selector device that differentiated between coins of different diameters could not be the basis for royalties on the entire laundry machines that included the devices).  Mr. Degen's use of the accused products as the smallest salable patent-practicing unit does not warrant exclusion of his opinion.

ICM alternatively argues that even if the accused products are deemed the smallest salable patent-practicing unit, Mr. Degen's opinion does not pass muster because the products have multiple features and he failed to apportion the value of the products between the various features.  ICM points to several district court opinions contending that they show that even when a patentee identifies the smallest salable unit, further apportionment is necessary between infringing and noninfringing features.[32]  ECF No. 268 at 17-18.  A review of the facts at issue in

---

[32]     Honeywell cites a competing set of district court cases in which no further apportionment occurred.  *See Internet Machs. LLC v. Alienware Corp*., Civ. No. 16-23, 2013 U.S. Dist. LEXIS 115723, at *43-45 (E.D. Tex. June 19, 2013) (finding it appropriate to use "switch sales" as the royalty base because the "switch" was the "smallest salable patent-practicing unit" and rejecting an argument that further apportionment was needed because "the switches contain non-patented features"); *Tomita Techs. USA, LLC v. Nintendo Co., Ltd*., Civ. No. 11-4256, 2013 U.S. Dist. LEXIS 116486, at *21-22 (S.D.N.Y. Aug. 14, 2013) (finding the entire market value rule not implicated where the component used as the base was the smallest salable patent-practicing unit); *Summit 6 LLC v. Research in Motion Corp*., Civ. No. 11-367, 2013 U.S. Dist. LEXIS 95164, at *33 n.11 (N.D. Tex. June 26, 2013) (noting that use of the "entire Samsung device" for the royalty base was appropriate "[b]ecause only the device can practice the patent and no other smaller component is even able to practice the patent"); *Broadcom Corp. v. Emulex Corp*., Civ. No. 09-1058, 2011 U.S. Dist. LEXIS 154416, at *17-19 (C.D. Cal. Dec. 13, 2011) (finding that sufficient evidence supported the jury's implicit determination that the "chips" rather than the

those cases shows that they presented scenarios in which even though the infringing component may have only been sold as part of a larger product offering, it was plausibly capable of being, and reasonably should have been, severed further. *See Rembrandt Soc. Media, LP v. Facebook, Inc.*, Civ. No. 13-158, 2013 U.S. Dist. LEXIS 171127, at *22-28 (E.D. Va. Dec. 3, 2013) (finding that allowing the patentee to use the "entire value of [Facebook's] Timeline, News Feed, Groups, and Photo/Video Sharing—all of which can be used independently without infringing—while not using the value of BigPipe and Audience Symbol—the features that actually cause the alleged infringement—would be a mistake of the same kind as allowing Rembrandt's expert to use the entire value of Facebook"); *Network Prot. Scis., LLC v. Fortinet, Inc.*, Civ. No. 12-1106, 2013 U.S. Dist. LEXIS 138890, at *3-4 (N.D. Cal. Sept. 26, 2013) (finding it improper to use the FortiOS software and the hardware on which it was installed as the royalty base, even though they were always sold together, when only the software infringed); *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, Civ. No. 11-5973, 2013 U.S. Dist. LEXIS 120403, at *7-12 (N.D. Cal. Aug. 22, 2013) (observing that the "DLP is an *optional* feature in the VCS product," which was the product sold, and "the patented feature is just one component of DLP").

These cases are consistent with the Federal Circuit's guidance that it is the "*general rule* that royalties are awarded based on the smallest salable patent-practicing unit." *Versata*, 717 F.3d at 1268 (emphasis added). They do not state a rule to the effect that after reaching the smallest salable patent-practicing unit, further apportionment is always necessary. They merely confirm that even when a patentee claims that a packaged or multi-component product is the smallest unit sold, a reasonableness check should occur to determine whether further apportionment of the royalty base is appropriate, before applying the allocation of value that the

---

"SerDes cores" were the "smallest saleable unit[s]" sold by the infringer and denying judgment as a matter of law despite evidence that other merchants sold the individual SerDes cores).

royalty rate embodies.  In other words, there must be a close enough relationship between the smallest salable infringing unit and the claimed invention.[33]  *See LaserDynamics*, 694 F.3d at 67.

To the extent ICM believes that Mr. Degen's computations would overcompensate Honeywell for any infringement found, it will be able to make its case at trial.  For purposes of determining whether his testimony is admissible, however, the Court does not find Mr. Degen's analysis deficient on account of a violation of the entire market rule.[34]  The facts before the Court do not reflect that a far more logical smaller infringing unit exists such that it was *Daubert* error to use the accused products for the royalty base.  While in some cases the nature of the accused product and the patented invention may make an expert's failure to further apportion the royalty base beyond the product sold grounds for exclusion, this is not one of them.

D. Miscellaneous testimony of Messrs. David Schumacher, Carl Degen, and Thomas Gafford

With this motion directed at Messrs. David Schumacher, Carl Degen, and Thomas Gafford, ICM does not seek to preclude them from testifying.  Rather it identifies individual paragraphs of their expert reports that it contends should be excluded.  ICM primarily argues that

---

[33]    The *Cornell* opinion cited in *LaserDynamics*, *see* 694 F.3d at 67, confirms that a "close relationship" to the claimed invention does not mean that the smallest salable unit cannot be used as the royalty base merely because it includes other features or functionality.  In discussing the facts involved, the *Cornell* opinion noted that "the parties do not dispute that the [patent at issue] reads on just one component of the instruction reorder buffer (IRB)," and "the claimed invention is a small part of the IRB, which is a part of a processor, which is part of a CPU module, which is part of a 'brick,' which is itself only part of the larger server."  609 F. Supp. 2d at 283.  The opinion chastised the plaintiffs' counsel for not abandoning a "royalty base claim encompassing a product with significant non-infringing components" and noted that "[t]he logical and readily available alternative was the smallest salable infringing unit with close relation to the claimed invention—namely the processor itself."  *Id.* at 287-88.  Thus, even though the IRB was one aspect of the processor, the royalty base did not need to be further apportioned.

[34]    ICM's *Daubert* motion does not contend that the royalty rates Mr. Degen used should be a basis for exclusion and so this order does not evaluate them.

the challenged testimony does not meet the helpfulness requirement of Rule 702 as it merely summarizes record evidence, states conclusory opinions, or invades the province of the jury.

The challenged portions of Mr. Schumacher's testimony relate to the trade dress and "Made in the USA" false advertising claims. The part of ICM's motion directed at Mr. Schumacher's testimony is moot. It will be denied on those grounds.

ICM seeks to exclude paragraphs 5-24 of Mr. Degen's initial damages report.[35] The challenged portion of the initial report is titled "Background" and outlines summary information about Honeywell, Honeywell's products at issue, Honeywell's sales and marketing of the products, the patents at issue, ICM, and Honeywell's claims. The section states Mr. Degen's understanding of those various items and identifies conversations, record evidence, and other resources as the source of the different pieces of information.

ICM suggests that the "Background" section is "an improper attempt to present, under the guise of an expert, selected testimony from the factual record and get inadmissible evidence before the jury that is not subject to cross examination." ECF No. 236 at 22. The challenged background section appears to merely provide context and state certain understandings that frame Mr. Degen's damages opinion. Moreover, Federal Rule of Evidence 703 protects against the concern ICM raises. It provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. ***But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.***

---

[35]   ICM also challenges paragraph 7 of his reply report, but since only the individual paragraph without much context is provided, the Court lacks sufficient information to rule on objection.

Fed. R. Evid. 703.  Presumably Honeywell will present fact witnesses for the type of information included in the background section of Mr. Degen's report.  But to the extent it attempts to introduce inadmissible evidence through Mr. Degen, ICM may raise an appropriate objection during trial and the Court will consider it under the applicable rules.

Mr. Gafford is one of Honeywell's technical experts, whose proposed testimony relates to Honeywell's patent infringement claims, as well as aspects of its trade dress and copyright claims.  ICM objects to a handful of paragraphs from the 214 paragraphs of his opening report and 283 paragraphs of his rebuttal report on two grounds.  First, ICM contends that some of the paragraphs of Mr. Gafford's reports impermissibly summarize factual evidence.  ECF No. 236 at 24.  As with Mr. Degen's testimony, to the extent Honeywell attempts to use Mr. Gafford to introduce inadmissible fact testimony, ICM can make an appropriate objection at trial.  Second, ICM objects to certain testimony regarding "copying" of ICM's manuals and labels as impermissibly invading the province of the jury.  The challenged paragraphs are included in a section of Mr. Gafford's rebuttal report that responds to "Vaczek Chapters 12-18."  Those chapters form section B of Mr. Vaczek's report, which the Court has excluded.  Presumably Mr. Gafford will no longer be testifying to that content.  ICM's request related to limitation of Messrs. Degen and Gafford's testimony will be denied without prejudice.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  ICM's motion for summary judgment of invalidity of U.S. Patent No. 5,812,061, U.S. Patent No. 7,055,759, and U.S. Patent No. 6,478,574 **[ECF No. 247]** is granted with respect to U.S. Patent No. 6,478,574 and otherwise denied.

2.  ICM's motion for summary judgment of Honeywell's false advertising (false designation of origin) claim **[ECF No. 241]** is granted.

3.  ICM's motion for summary judgment of Honeywell's trade dress infringement claims **[ECF No. 260]** is granted.

4.  Honeywell's *Daubert* motion seeking to exclude testimony of Robert Stein, Leon Kaplan, and Adam Vaczek **[ECF No. 273]** is denied as to Mr. Stein on mootness grounds.  It is denied without prejudice as to Dr. Kaplan as stated in this order.  The motion is granted in part and denied in part as to Mr. Vaczek as stated in this order.

5.  ICM's *Daubert* motion to exclude the testimony of Akshay Rao **[ECF No. 253]** is denied as moot.

6.  ICM's *Daubert* motion to exclude the testimony of Justin Hughes **[ECF No. 227]** is granted.

7.  ICM's *Daubert* motion to exclude the reasonable royalty opinions of Carl Degen **[ECF No. 266]** is denied.

8.  ICM's *Daubert* motion to exclude miscellaneous testimony of David Schumacher, Carl Degen, and Thomas Gafford **[ECF No. 234]** is denied as to Mr. Schumacher and in part as to Mr. Gafford on mootness grounds.  The motion is denied as to Mr. Degen and in part as to Mr. Gafford without prejudice so that objections to particular testimony may be raised at trial, if appropriate.

9.  If Honeywell intends to pursue Count XVII of the amended complaint, it must file a brief within three weeks of the date of this order to address the issues identified with that count.  ICM may file a responsive brief on the subject within two weeks of any such filing by Honeywell.


Dated:  August 27, 2014

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
